ALAN L. FRANK ●*+▫
KYLE M. KULZER*+
SAMANTHA A. MILLROOD*+
EVAN L. FRANK *+♪∆
JORDAN E. FRANK *+▫
JACLYN H. FRANK *+♪
PATRICK W. BROWN *■+▫
SERGIY MELNYK*

 PARALEGALS
DEBRA E. MCGUCKIN
DEE A. WILK
DAWN M. WELSH


● Certified by the NJ Supreme Court
   as a Civil Trial Attorney
* MEMBER PA BAR
+ MEMBER NJ BAR
▫ MEMBER NY BAR
♪ MEMBER FL BAR
■ MEMBER DC BAR
∆ REGISTERED PATENT ATTORNEY

# ALAN L. FRANK
# LAW ASSOCIATES, P.C.
Attorneys at Law

**135 OLD YORK ROAD**
**JENKINTOWN, PA 19046**
**(215) 935-1000**
**FAX NO. (215) 935-1110**

NEW JERSEY OFFICE

1103 LAUREL OAK ROAD
SUITE 140
VOORHEES, NJ 08043

**E-MAIL ADDRESS:**
**afrank@alflaw.net**

October 20, 2023

**Via ECF**
Honorable Katharine H. Parker
Daniel Patrick Moynihan United States Courthouse
500 Pearl St., New York, NY 10007

      Re:    **Johnson v. Esports Entertainment Group – 1:22-cv-10861**
             **Defense instructions to deponent not to answer questions.**

Dear Judge Parker:

    I am writing to request a ruling on defense counsel's instructions to deponent Joseph Lucosky not to answer certain questions.  Below are 1) the reasons why this deposition testimony is important, 2) the reasons Defendant's objections should be overruled, 3) the disputed questions and objections (bolded) in their context (normal font).

**1.    The testimony is important because it establishes that Defendant knew Plaintiff did not control the shares in his trust.  This defeats Defendant's theory that Plaintiff duped the company by voting his trust shares the wrong way.**

    In Defendant's own words, Defendant's theory of the case is as follows (taken from Defendant's pre-MSJ letter at ECF 67):

> Johnson was properly terminated for cause pursuant to his Employment Agreement after: (i) Johnson admittedly signed the May 28, 2021 Securities Purchase Agreement between Esports and Ayrton ("Securities Agreement") borrowing Thirty-Five Million Dollars in exchange for, among other things, Johnson's individual agreement to vote the Esports shares he controlled in favor of converting said debt to equity in Esports; (ii) Johnson admittedly certified he controlled shares held in a trust for his benefit; (iii) said trust admittedly voted against the debt conversion; and (iv) as a result, Ayrton refused to work with Esports while Johnson remained CEO.

ECF 67, p. 1.

The importance of the Lucosky deposition is that it established that Defendant knew that Plaintiff (Johnson) did not control the shares in his trust.  Since, Defendant knew that Johnson did not control the shares in his trust, two parts of Defendant's theory have to be wrong: (i) "… vote the Esports shares he controlled …" and (ii) "… he controlled shares held in a trust …"  If Johnson did not control the shares and Defendant knew it, then neither statement can be true. Lucosky testified, for example, as follows:

> Q. Some of the information was delivered to you by other people and I think those people, unless I misheard your testimony, would be Dan Marks, Stuart Tilly, Damian Matthews, and Alan Alden; right?
> A. Yeah, and occasionally Lydia who was, you know, internal general counsel, although, not on the board.
> Q. Were these people based upon, you know, the conversations you had with them demonstrating to you that they had a understanding that Grant did not control the vote of his shares in the trust?
> A. I don't know if --
> Q. Wasn't that a common understanding?
> A. I don't know what they understood or didn't understand. But, in my world, it was generally known that was the understanding.
> Q. That Grant did not control his shares in his trust, the vote?
> A. Again, I don't know what they individually understood. But, from my perspective, we certainly understood it and generally, I believe, they understood it.

Lucosky Dep., 44:11 – 45:10.

**2.    The Court should overrule the objections because the conversations at issue occurred while Plaintiff was CEO of Defendant and the testimony establishes that Plaintiff was already aware of the objected-to information.  .**

The issue underlying every disputed question is the same:  The deponent Joseph Lucosky is an attorney, he was an attorney for Defendant, and at least in some contexts his communications would be privileged.  So far, the parties are in agreement – Plaintiff agrees that Lucosky is an attorney, he was an attorney for Defendant, and (depending on the context) there is an attorney-client privilege.  The question is the application to the specific questions set out below.  Here, the attorney-client privilege has no application because the communications occurred while Plaintiff was CEO of Defendant and the testimony also establishes that Plaintiff was already aware of the communications.  Since Plaintiff was already aware of the communications and in some cases a party to the communications, they cannot be privileged against him.

3. **Disputed questions and objections in bold with context in normal font.**

These questions and objections require the Court's decision:

Q. Did you -- did you have a general understanding as to the members of the board of directors and officers of this company that they understood during the period of your representation that Grant Johnson did not control the vote over the shares in his trust?
MR. MASRI: Objection.
Q. You can answer.
MR. MASRI: Privilege.
MR. FRANK: Oh, it's privilege?
MR. MASRI: Objection. Privilege. Can't answer.
MR. FRANK: Why? Why is that privileged?
MR. MASRI: You're asking what the other board members were thinking. And here -- so that's a separate objection separate and apart. But there are conversations that he's having with board members and exclusively with board members which are covered by your question. And how outside of privileged communications would Mr. Luckosky be able to form an impression to begin with?
MR. FRANK: My answer to you is, actually, pretty straightforward. At the beginning of this deposition, I asked Mr. Luckosky whether he ever had any conversations with members of the board where the subject matter was not known to Grant; and he was quite clear in his answer. And his answer is, and I think remains, that there's nothing here that was not known to Grant. So I don't think there is a privilege, a confidence, an attorney-client or other privilege applicable to members of the board when the subject matter is widely known to all members of the board, including my client. Now, I'll -- you know, we'll visit with the Court and ask for a ruling on this but I'm asking to you reconsider.
MR. MASRI: Yeah. But the testimony was that Grant was generally involved in a lot -- in everything that was going on or that Grant had a general understanding. But it also -- your question presupposes that there weren't other conversations where Grant wasn't present. The fact that Grant may have had his own opinion as to what was discussed, that's not relevant to the question of privilege and to the communications that this witness had with board members that were formed part of the basis for his answer as to what those board members understandings could have been to the extents that he even knows.
MR. FRANK: All right. So I'm going to present this question and subject matter to the Court. So let me just make the question as clean as I can.
***DIRECTION/RULING:
Q. So, Mr. Luckosky, I think you're going to be instructed not to answer this question and maybe the next couple. So just bear with us for a minute, please.
**Mr. Luckosky, did you form a view based on considerations you had with members of the board of directors as to whether they did or did not understand that the shares owned by Mr. Johnson's trust were not by way of vote, at least, controlled by Mr. Johnson?**

*Please visit us at www.alflaw.net*

MR. FRANK: Are you instructing him not to answer that question?
MR. MASRI: Can I have that question read back, please.
(Whereupon, the requested portion of the record was read by the reporter.)
**MR. MASRI: Objection.**
**Direct the witness not to answer.**
MR. FRANK: Okay.
**Q. And, likewise, with respect to the meeting, evidently, that occurred on December 16, 2021, Mr. Luckosky, where you were a participant and witness and Mr. Johnson was present, do you have a recollection of whether the board generally understood that Mr. Johnson's shares in trust, that the vote of those shares would not be controlled by Mr. Johnson?**
MR. MASRI: Can I have that read back, please.
(Whereupon, the requested portion of the record was read by the reporter.)
MR. MASRI: So, Alan, just for clarification, you're not asking -- it sounds like you're not asking about specific to that meeting where Grant Johnson was present, are you?
MR. FRANK: I'm asking the question that I asked. I don't know how to better phrase it. I'm not trying to be impolite. I just can't –
MR. MASRI: I dont' --
(Indiscernible/unreportable simultaneous speakers.)
MR. FRANK: Just let me finish.
MR. MASRI: Sure.
MR. FRANK: Basically, what I'm trying to find out is why the board expected the vote to be negative and if the reason was, at least in part, that some of Mr. Johnson's substantial block of shares was under the Trust, the vote to which he could not control; that's what I'm trying
to pin down.
Are you going to let him answer that?
**MR. MASRI: I don't have an issue if you would rephrase the question to focus on just that December 16, 2021 meeting where Mr. Grant Johnson was present, then I wouldn't object. But I asked for clarification and then you said,**
**Well, the question is what the question is, or words to that effect. I had it read back to me and it wasn't narrowed.**
MR. FRANK: Okay. So let's respond to Mr. Masri. So I don't agree to narrow the question. I want the other two questions to stand.
Q. But I will, nonetheless, ask you now to answer a slightly narrower question, that is:
Whether on or about the date of this meeting you had an understanding as to what the shareholder -- the directors of the company believed to be the reason for its prediction and your prediction or Grant Johnson's prediction that the vote would fail, whether that depended upon the fact that many of Mr. Johnson's shares were held in trust.
MR. MASRI: Can I have that read back, please.
(Whereupon, the requested portion of the record was read by the reporter.)
MR. MASRI: You can answer, if you can.

A. I -- I -- I am confused as to where we are. You want to say it a little different for me, Alan? I'm not sure what --

Q. I'm just -- I'm just trying understand whether it was common knowledge, at least based upon the words that people used if --

A. Well, I think as a precursor to this meeting. You know, Grant had reported to the board separately -- I was not involved in any of those conversations -- and reported to me what his opinions were of the vote, whether it was likely to pass or not.

***RULING:

Q. Okay. And did you have --

**Was it the general understanding as expressed to you by members of the board that they knew that a lot of Mr. Johnson's shares were held in trust?**

MR. MASRI: Can I have that question read back, please. (Whereupon, the requested portion of the record was read by the reporter.)

MR. MASRI: **Objection. It's -- the issue is whether or not there were conversations -- the basis of the objection is whether or not there were conversations between Mr. Luckosky separate and apart from conversations where Mr. Johnson was present. So if Mr. Luckosky can answer that question without referencing conversations where Mr. Johnson was not present, then he can answer.**

MR. FRANK: So I'm not agreeing to that limitation because I will present the question to the Court.

Q. Could you answer that part of the question that Mr. Masri is allowing you to answer?

A. Which is what?

Q. So were there conversations in your presence when Mr. Johnson was present with other directors where the other directors used words or heard words to suggest to you that they knew that Mr. Johnson's shares were held in trust?

A. I don't recollect any -- any direct conversations of -- on this topic. But my recollection is generally everyone was aware of the situation.

Q. Can you explain that, please?

A. It means I don't recollect any individual conversations with members of the board regarding the legalities or logistics of the Trust. But I do generally remember that my impression at the time was that everybody was aware of how it worked.

Q. Can you explain to us what you mean by the phrase "how it worked"? What do you mean?

A. That there was a separate trustee who had to make an independent decision on voting the shares. But, again, keep in mind, my main point of contact at the company was Grant. So most of my information, 95-plus percent of it, came from Grant –

Lucosky Dep., 25:8 – 34:22

*Please visit us at www.alflaw.net*

                                        Respectfully submitted,
                                        /s/ Alan L. Frank
                                        Alan L. Frank, Esq.